UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JAMES S. AND MICHELLE S.,
individually and on behalf of their son
J.S., and J.S.,
               Plaintiffs,

      v.                                                   C.A. No. 11-236 ML

TOWN OF LINCOLN and LINCOLN SCHOOL
DEPARTMENT,
               Defendants.

## MEMORANDUM AND ORDER

       This case is brought by James S. and Michelle S., ("Mrs. S.") individually and on behalf

of their son, J.S., and J.S., ("Plaintiffs"), pursuant to the Individuals with Disabilities Education

Act, 20 U.S.C. § 1400 et seq. ("IDEA").  Plaintiffs seek reversal of a hearing officer's decision

that J.S. made progress in the Lincoln Public School System and that the Lincoln School

Department's ("Lincoln") August 28, 2008, individual educational plan ("IEP") was designed to

provide J.S. with a free appropriate public education ("FAPE").  Defendants seek an order

affirming the hearing officer's decision.  The matter is before the Court on the parties' cross-

motions for summary judgment.

### I.  Factual Background[1]

      J.S. attended kindergarten and first grade in the North Providence Public Schools.

---

[1]Plaintiffs brought the administrative action seeking reimbursement of the costs of placing J.S. in a private school.  The administrative hearing unfolded over a seven-day period and included in excess of 100 exhibits. Plaintiff presented testimony from Mrs. S., Dr. Jessica Lord, a psychologist, and Dr. Bruce Roscow, the academic dean at the Greenwood School in Putney, Vermont.  Defendants presented testimony from two of J.S.'s sixth grade teachers and J.S.'s school social worker.  The facts have been summarized to focus on the issues that are most pertinent to the question of J.S.'s need for educational services.

During first grade, however, J.S.'s family moved to Lincoln and J.S. began attending Lincoln Public Schools.  Lincoln prepared its first IEP for J.S. in April 2002.[2]  At least fourteen IEPs were implemented during the time J.S. attended Lincoln schools.  Mrs. S.[3] signed and accepted the educational program in a majority of those IEPs.  Throughout his academic career in the Lincoln school system, J.S.'s teachers described him as polite, well-behaved, cooperative, respectful, and motivated to learn.

As part of its evaluation process, Lincoln prepared quarterly reports on J.S.'s IEP goals and objectives.  The reports measured J.S.'s progress by noting whether he (1) had achieved the objective, (2) made progress toward the objective, or (3) made no progress toward the objective.[4]  An April 1, 2002, progress report for first grade reflected that J.S. was making progress on all educational goals and objectives and that he had achieved two short-term objectives out of twenty-six.  At the end of the 2001-2002 academic year, however, Lincoln recommended that J.S. repeat the first grade and Mrs. S. agreed.

J.S. repeated first grade in the September 2002-June 2003 academic year.  During the latter part of the school year, Lincoln provided a reading specialist from the Dyslexia Association to work with J.S.  A June 4, 2003, progress report reflected that J.S. was making progress on all educational goals.  During the summer of 2003, J.S. attended a summer reading program for children with dyslexia.  By the end of the summer, J.S.began to read.

---

[2]At the administrative hearing, Defendants objected to the introduction of evidence relating to J.S.'s early educational history in the Lincoln school system.  The hearing officer, however, allowed introduction of the evidence.

[3]For ease of reference, the Court refers to parental action in this case as the action of Mrs. S.

[4]The progress reports also noted whether the objective had been addressed in the particular reporting period.

J.S. was placed in a self-contained classroom in second grade (September 2003-June 2004).[5]   During second grade, J.S. improved from a level 5 to a level 14 in reading.  A June 10, 2004, progress report reflected that J.S. was making progress on all educational goals.  Again, during the summer of 2004, J.S. attended the summer reading program for children with dyslexia.  By the end of the summer, J.S.'s reading skills had improved significantly.

For third grade (September 2004-June 2005) J.S. remained in a self-contained classroom.  At the administrative hearing, Mrs. S. testified that she often observed J.S. in his second and third grade classroom and that he was distracted and disorganized.  A September 2004 Lincoln referral for evaluation report stated that J.S. showed weakness in written expression but that he had "improved tremendously" in reading and math.  Plaintiffs Exhibit 17 at 2.

Mrs. S. testified that it was during third grade that J.S. first started exhibiting a negative attitude toward school.  In October 2004, Lincoln performed a special education reevaluation of J.S., and although his intelligence quotient was in the high average range and his reading vocabulary was in the 97th percentile, he scored extremely low in math calculation, math fluency and spelling.  IEP meetings were conducted in December 2004 and February 2005.  Once again, a progress report reflected that J.S. was making progress on all educational goals.  During third grade, J.S. no longer qualified for special education services in reading.

Mrs. S. did not accept the educational program outlined in a May 12, 2005, IEP.  The IEP provided that J.S. was to spend 22.5 hours per week in a self-contained classroom.  The progress report on the May 12, 2005, IEP showed that J.S. made progress.

In fourth grade (September 2005-June 2006) J.S. was placed in a co-taught regular

---

[5]A self-contained classroom is a small special education class with ten or fewer students.

education classroom over Mrs. S.'s objection.  J.S. was in the regular education classroom for 19.5 hours per week with 7.5 hours of special education support for writing, math, and certain "behavior" issues, i.e., work initiation and attention.  Mrs. S. opposed this placement because she believed J.S. was having difficulties in the self-contained classroom and she feared he would be overwhelmed in the regular education classroom.  Mrs. S visited J.S.'s fourth grade classroom occasionally.  She believed that J.S. was disruptive to the class because J.S. was often not on task and he had to be repeatedly redirected by the teacher.  The progress report on J.S.'s March 30, 2006, IEP showed progress in all areas and the attainment of four goals.

In April 2006, J.S. underwent a neuropsychological assessment.  J.S. was diagnosed with dyslexia, auditory processing disorder, written language disorder and attention deficit disorder.  Mrs. S. arranged for several other independent evaluations of J.S. and she provided the results of the evaluations to Lincoln.

J.S. was in a co-taught regular education classroom for fifth grade (September 2006-June 2007).  In September 2006, J.S. underwent a psychological evaluation which concluded that J.S.'s "presentation" was "consistent with a diagnosis of Asperger's Syndrome."  Plaintiffs' Exhibit 47 at 14.  In May 2007, Mrs. S. visited the Lincoln Middle School to view a self-contained classroom that Lincoln was recommending for J.S. for the following school year.  Mrs. S., however, decided that a self-contained classroom was not an appropriate placement for J.S.

In the summer of 2007 Mrs. S received a letter from Lincoln requesting parental consent for J.S. to undergo a clinical psychological evaluation.  Mrs. S. agreed to the evaluation; she selected Dr. Karen Holler to perform the evaluation.  During a June 14, 2007, IEP meeting, Mrs. S. requested that J.S. be placed in a private school.  Lincoln, however, did not agree that the

4

appropriate placement for J.S. was a private school.  Mrs. S did not sign the June 14, 2007, IEP.

J.S.'s fifth grade report card reflected the following grades: reading B-, writing D, spelling A-, math C+, science B, and social studies B+.  In homework, listening, independent working, and following directions, J.S. received grades of "poor."  The progress report on the June 14, 2007, IEP showed that J.S. was making progress.

For sixth grade (September 2007-June 2008) J.S. returned to a self-contained classroom for 6 hours per week, later increased to 11 hours per week, with an additional 7.5 hours of special education support.  In November 2007, Mrs. S requested an IEP meeting because J.S. was experiencing problems in math class.  Mrs. S. testified at the administrative hearing that, in sixth grade, she had significant difficulty in getting J.S. to go to school.  At or near this time, J.S. became unwilling to do his homework and Mrs. S. hired a tutor.  J.S., however, chose not to work with the tutor.  By the end of the school year, Mrs. S. could not get J.S. to do his homework.

Mrs. S.'s testimony at the administrative hearing covered approximately 400 pages and was supplemented by approximately 90 exhibits.  Mrs. S.'s testimony detailed her dissatisfaction with J.S.'s progress in the Lincoln school system.  Although Mrs. S. testified that J.S. possessed a good vocabulary, she also testified that he had significant difficulties in reading (comprehension and drawing inferences), writing, and basic math.  She also explained that J.S. did not perform well in spelling and was unable to complete his homework without help.  Mrs. S. admitted that she was confused about the meaning of the term "progress" on Lincoln reports.  She measured J.S.'s progress by comparing J.S. to her two daughters.

Amy Delfarno ("Delfarno"), J.S.'s sixth grade special education teacher, testified that

J.S. made academic and organizational gains in sixth grade.  Delfarno stated that J.S. was able to work independently but he often needed breaks.  Delfarno testified that J.S. completed several writing assignments that were assigned to regular education students.  Delfarno stated that she modified J.S's. math curriculum by allowing him to use multiplication charts and a calculator.  Near the end of sixth grade, J.S. tested at one year below grade in reading fluency (i.e., speed and accuracy) while his reading comprehension was at a high-average level.

Although Delfarno modified some assignments for J.S., J.S. received a grade of 83 on an unmodified social studies' test.  Delfarno testified that it was difficult to make J.S. accountable for his homework, and although she offered to stay after school to help J.S. with his homework, Mrs. S. declined Delfarno's offer.  Delfarno testified that she did not understand why J.S. was not doing his homework because he was "performing and doing [the] work in school."  January 10, 2011, Transcript at 99.

Pamela Mackey ("Mackey"), J.S.'s sixth grade regular education science teacher, testified that J.S. was able to handle the class work but, at times, required modifications from Delfarno.  J.S. passed all of his subjects in sixth grade and for final grades received three As, two Bs and one C.  Delfarno testified, however, that these grades were based on J.S.'s "individualized instruction."  Id. at 138.  A progress report issued in April of 2008 reflected that J.S. was making progress in all areas and that he had attained two short-term objectives out of approximately forty.

Dr. Holler, a neuropsychologist, began her evaluation of J.S. in April 2008.  At or about the same time, Mrs. S. arranged for an independent neuropsychological evaluation by Dr. Jessica Lord.  The purpose of Dr. Lord's evaluation was to gain information on J.S.'s social-emotional

functioning and to obtain recommendations to help address J.S.'s needs at home and in school.

Both Dr. Holler and Dr. Lord furnished their reports to Mrs. S. and Lincoln in June 2008.

Dr. Lord testified at the administrative hearing as an expert in psychology and neuropsychology. She reviewed a plethora of evaluations, testing, consultations and classroom observation reports on J.S. She also observed J.S. on two occasions in his sixth grade class, once for 30-45 minutes and on another occasion for 90 minutes. Based upon her evaluation, Dr. Lord concluded that Lincoln could not meet J.S.'s needs and she recommended an out-of-district placement. Dr. Lord's evaluation results were consistent with J.S.'s diagnosis of Asperger's Syndrome. Both Dr. Lord and Dr. Holler made numerous recommendations to aid J.S. both at home and in school. Dr. Lord testified that she agreed with all of Dr. Holler's recommendations.

The August 28, 2008, IEP, for seventh grade (Sept. 2009- June 2009), was the last IEP Lincoln developed for J.S. Delfarno used both Dr. Lord's and Dr. Holler's reports as a basis for developing the August 28, 2008, IEP. Among other things, the IEP provided that J.S. would receive small group instruction in math and reading/written language for 6 hours per week and an additional 3 hours per week of special education support. J.S. was placed in regular education for some math and language classes.

Mrs. S. attended the August 28, 2008, IEP meeting with counsel. Mrs. S. testified that after the "draft IEP was reviewed" she stepped outside the room in which the IEP meeting was being held to "consider the IEP." November 9, 2010 Transcript at 95 (emphasis added). When she returned to the meeting, Mrs. S.'s attorney informed the IEP team of Mrs. S.'s numerous concerns with the IEP.[6] During this

---

[6]It is not clear from the record, however, whether the IEP team had an opportunity to discuss Mrs. S.'s concerns about the draft IEP or whether Mrs. S. suggested changes to the draft.

meeting, Mrs. S. informed the IEP team that she was placing J.S. in a private school and that she would be seeking public funding for the placement.

On direct examination Dr. Lord testified that she reviewed J.S's "current IEP" to gather information for her report.  November 29, 2010, Transcript at 30.  However, on cross examination Dr. Lord testified that she could not specifically recall whether she reviewed the August 2008 IEP.  She testified that she did not believe she did.  Dr. Lord admitted, however, that she had "no firsthand knowledge as to the program that Lincoln was proposing for [J.S.] for the 2008/2009 school year . . . if it differed significantly from the program that [she] observed and reviewed."  December 8, 2011,Transcript at 12.

Mrs. S decided that the Greenwood School in Putney, Vermont would be a better placement for J.S.  Mrs. S. placed J.S. at the Greenwood School for the 2008-2009 school year.  Greenwood's tuition for the 2008-2009 school year was $55,640 and J.S. received a $10,000 scholarship.  J.S. attended Greenwood for the 2009-10 and 2010-11 academic years without payment of tuition but with the understanding that if Mrs. S. were successful in receiving public funds for the placement at Greenwood, Greenwood would be paid the outstanding tuition.

The hearing officer determined that the "overall evidence" established that J.S. made "progress in written language, and expression, in behavior and social interaction, mathematics, reading, focus, science and social studies from 2002-2008."  Hearing Officer's Decision at 38.  The hearing officer concluded that J.S. benefitted from the educational instruction that he received while in the Lincoln school system.  He also determined that the August 28, 2008, IEP was "designed for the unique needs of [J.S.] with supports that would provide [J.S.] with an

educational benefit from the instruction."   Id. at 44. [7]

## II.  Standard of Review

In considering an appeal from a hearing officer's decision under the IDEA, the Court reviews the administrative record and "makes an independent ruling based on the preponderance of the evidence."  LT. T.B. ex rel. N.B. v. Warwick School Committee, 361 F.3d 80, 83 (1st Cir. 2004) (internal quotation marks and citation omitted); Lessard v. Wilton-Lyndeborough Cooperative School District, 518 F.3d 18, 24 (1st Cir. 2008).  In its determination, the Court is required to give "due weight" to the findings by the hearing officer.  LT. T.B., 361 F.3d at 83 (internal quotation marks and citation omitted); see also Abrahamson v. Hershman, 701 F.2d 223, 231 (1st Cir. 1983) (noting "due deference" standard).  Because judges, generally, are not "trained pedagogues . . . they must accord deference to the state agency's application of its specialized knowledge."  Lessard, 518 F.3d at 24.  A "district court, faced with conflicting expert testimony . . . may justifiably feel bound to affirm the state agency's determination."  Id. (internal quotation marks and citation omitted).  As a consequence, "judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard."  Id.

When, as in this case, the parties choose not to submit additional evidence, the parties' cross-motions for summary judgment serve as a procedural device through which the Court decides the case on the basis of the administrative record; the burden of proof rests with the party seeking to overturn the hearing officer's decision.  See Linda E. v. Bristol Warren Regional School District, 758  F. Supp. 2d 75, 87 (D.R.I. 2010).

---

[7]Because the hearing officer determined that the August 2008 IEP provided J.S. with a FAPE, he did not consider whether the Greenwood School was an appropriate placement for J.S.

9

III.  IDEA Overview

The purpose of the IDEA is "to guarantee a free and appropriate public education."  <u>Gary S. v. Manchester School District</u>, 374 F.3d 15, 23 (1st Cir. 2004).  Federal funding is provided to the states in order "to assist them to provide special education and related services to children with disabilities. . . ."  20 U.S.C. § 1411(a)(1).  To qualify for such funding, a State must ensure that "[a] free appropriate public education ["FAPE"] is available to all children with disabilities residing in the State between the ages of 3 and 21 . . . ."  20 U.S.C. § 1412 (a)(1)(A).  A FAPE is defined as "special education and related services" that, inter alia, are "provided at public expense . . . without charge," 20 U.S.C. § 1401(9), and it encompasses "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings[.]"  20 U.S.C. § 1401(29) & (29)(A).  Because, under the IDEA, mainstreaming is preferred, "the goal . . . is to find the least restrictive educational environment that will accommodate the child's legitimate needs."  <u>C.G. ex rel. A.S. v. Five Town Community School District</u>, 513 F.3d 279, 285 (1st Cir. 2008).

School systems are required "to identify children who may qualify as disabled, evaluate each such child to determine his or eligibility for statutory benefits, and develop a customized IEP designed to ensure that the child receives a level of educational benefits commensurate with a FAPE."  <u>Id.</u>  The "primary vehicle for delivery of a FAPE is the child's IEP."  <u>Lessard</u>, 518 F.3d at 23.  If a disabled child is not provided with a FAPE through placement at a public school, the school system may be responsible for reasonable costs of a private placement.  <u>Five Town Community School District</u>, 513 F.3d at 284-285.

The IDEA contains certain procedural safeguards if the state or local educational agency does not follow the procedures set forth in the IDEA. Smith v. Fitchburg Public Schools, 401 F.3d 16, 21-22 (1st Cir. 2005). Students and their parents are entitled under the IDEA to request an impartial due process hearing by the local educational authority ("LEA"), to appeal a decision by the LEA to the state educational agency, and to file a suit against the school department. 20 U.S.C. §§ 1415(b)(6); (f)(1); (i)(2); Doe v. Boston Public School., 358 F.3d 20, 23 (1st Cir. 2004).

A state satisfies the requirement to provide a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176, 203 (1982); Five Town Community School District, 513 F.3d at 284 (school district meets FAPE obligation as long as program offered is "reasonably calculated to deliver educational benefits") (internal quotation marks and citation omitted); Sebastian M. v. King Philip Regional School District, 685 F.3d 79, 84 (1st Cir. 2012) (to comply with the IDEA, an IEP need only be "reasonably calculated to confer a meaningful education benefit") (internal quotation marks and citation omitted). "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make . . . access [to public education] meaningful." Rowley, 458 U.S. at 192.

> Thus, the IDEA's requirements with respect to the development of IEPs does not imply that a disabled child is entitled to the maximum educational benefit possible. Rather, [a]n IEP need only supply some educational benefit not an optimal or an ideal level of educational benefit, in order to survive judicial scrutiny.

Sudbury Public Schools v. Massachusetts Department of Elementary and Secondary Education,

11

762 F. Supp. 2d 254, 261 (D. Mass. 2010) (internal quotation marks and citations omitted);

see also J.L. v. Francis Howell R-3 School District, 693 F. Supp. 2d 1009, 1014 (E.D. Mo.

2010) (IDEA requires a school district to provide "educational equivalent of a serviceable

Chevrolet . . . not . . . a Cadillac") (internal quotation marks and citation omitted).  In the final

analysis, the IDEA requires school districts to provide "a basic floor of opportunity[,]" that is,

"access to specialized instruction and related services which are individually designed to provide

educational benefit" to the child.  Rowley, 458 U.S. at 201 (internal quotation marks and citation

omitted).

"When parents unilaterally place their child in a private school . . . they are entitled to

reimbursement only if a federal court concludes . . . that [1] the public placement violated [the]

IDEA and[,] [2] that the private school placement was proper under the [IDEA]."  Slater v.

Exeter-West Greenwich Regional School District, No. CA 06-527 ML, 2007 WL 2067719 at *3

(D.R.I. July 16, 2007) (internal quotation marks and citation omitted).  While Mrs. S "had every

right to enroll [J.S.] at [the Greenwood School] while [she] challenged [Lincoln's] IEP, [she]

acted at [her] own financial risk in doing so."  Id. (internal quotation marks and citation

omitted).

## IV.  Analysis
### Did the Public Placement Violate the IDEA?

Plaintiffs seek reimbursement of the cost of placing J.S. at the Greenwood

School.  Plaintiffs face an uphill climb – given the underlying burden of proof and the applicable

standards of administrative review – Plaintiffs must convince this Court, giving "due weight" to

the hearing officer's decision and "due deference" to his findings of fact, that the hearing officer

12

erred in determining that J.S. made progress in the Lincoln school system and that the August

28, 2008, IEP was designed to provide J.S. with a FAPE.  See generally Beitle v. East

Greenwhich School Committee, No. Civ. A. 06-62ML, 2006 WL 3095658 (D.R.I. October 27,

2006).  Plaintiffs urge the Court to find that this is one of those "relatively rare cases" where a

review of the administrative record compels the conclusion that the hearing officer's decision

should be reversed.  Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for

Summary Judgment ("Plaintiffs' Memorandum") at 3.   Plaintiffs' position, however, is belied

by the evidence.

### A.  Did J.S Make Legally Adequate Progress in Lincoln?

Plaintiffs focus on the hearing officer's interpretation of the evidence.  Plaintiffs contend

that the hearing officer misconstrued, overlooked, or failed to appreciate certain evidence.

Defendants aver that the hearing officer considered all the pertinent evidence.  It is not surprising

that, based on the length of the administrative hearing, the testimony elicited, and the

documentary evidence admitted, the hearing officer was presented with conflicting evidence.

The Court has reviewed the underlying record and finds that the hearing officer's factual

findings have sufficient evidentiary support and are entitled to due deference.  Likewise, the

hearing officer's resolution of material conflicts is supported in the record.  See generally Five

Town Community School District, 513 F.3d at 287 n.4 (district court may choose among

conflicting inferences suggested by the evidence).  Furthermore, the hearing officer properly

applied the law to his factual findings.

The crux of Plaintiffs' first argument rests on the allegation that J.S. made "little to no

progress in many fundamental areas of educational need."  Plaintiffs' Memorandum at 2.

Plaintiffs argue that the hearing officer's conclusion that J.S. made progress in sixth grade and in previous years is controverted by the evidence. Plaintiffs contend that J.S. made only "trivial" educational progress while in the Lincoln school system. Plaintiffs' Memorandum at 66. Plaintiffs aver that the progress reports relied upon by the hearing officer are not evidence of meaningful educational progress because the progress reports summarize alleged progress made on IEPs whose goals, objectives and present levels of performance remained virtually unchanged from one year to the next.

The hearing officer concluded that the "overall evidence" established that J.S. made legally adequate progress from 2002-2008, i.e., J.S. "benefit[ted] from [the] instruction." Hearing Officer's Decision at 38 (quoting Rowley, 458 U.S. at 189). This finding was based, *in part*, on the hearing officer's review of J.S.'s progress reports. As noted above, those reports documented J.S.'s performance relative to the goals and objectives as set forth in the IEPs. In reviewing the IEPs in light of Plaintiffs' argument that they were recycled, the hearing officer found that some of the goals did remain unchanged during the same academic year. The hearing officer concluded, however, that the consistency of the goals was reasonable because, in many instances, it would take a full academic year to determine whether progress was made on a specific goal or whether the goal was achieved. See generally L.K. v. Department of Education of the City of New York, No. 09-CV-2266 (RMM) (LB), 2011 WL 127063 (E.D.N.Y. Jan. 13, 2011) (during a school year annual goals would not change significantly).

In further addressing Plaintiffs' claim, the hearing officer also found that some of the IEP goals and objectives and present levels of performance changed from year to year. Where the hearing officer found that an objective was repeated in grades four through six, he concluded that

"other evidence demonstrate[d] progress in that area."  Hearing Officer's Decision at 37.[8]  The

record supports the hearing officer's findings.

As noted above, however, the hearing officer did not rely *solely* on the progress reports in

concluding that J.S. made progress.  In finding that J.S. made progress, the hearing officer also

considered J.S.'s classroom performance and work product and the testimony of J.S.'s sixth

grade teachers.  The Court finds the testimony of J.S.'s sixth grade teachers particularly

informative.

As J.S.'s special education teacher, Delfarno had daily contact with J.S.  Delfarno

testified that J.S. made academic and organizational gains in sixth grade.  She also testified that

J.S. needed more support in subjects he was disinterested in and less support in those subjects in

which he was engaged.  This is not surprising for any student.  Delfarno testified that it was

> important to note that the curriculum that [J.S.] was exposed to was what every
> 6th grader was exposed to.  It may have been to varying degrees, so he may not
> have covered or had the work output of every 6th grader, but he was exposed to
> most of the content that every 6th grader is exposed to and did make progress, but
> he did have to have a lot of support in order to do that.

January 10, 2011, Transcript at 139 (emphasis added).

Delfarno also testified that Mrs. S. requested that she use a math compact disc that

enabled J.S. to learn his math facts using picture stories and songs.  "So we used that as well in

order to work on his . . . fluency and continued to work on that.  But [J.S.] was able to approach

6th grade math topics using the supports and learn the processes. . . ."  Id.  at 21 (emphasis

---

[8]The "fact that the goals remained the same does not compel the inference that no progress occurred, in
view of the evidence in the record indicating that [J.S.] did in fact make progress."  W.R. v. Union Beach Board of
Education, No. 09-2268, 2010 WL 1644138 at *9 n.4 (D.N.J. April 22, 2010), aff'd, 414 F. App'x 499 (3d Cir.
2011); see also James D. v. Board of Education of Aptakisic-Tripp Community Consolidated School District No.
102, 642 F. Supp. 2d 804, 827 (N.D. Ill. 2009) ("mere fact that a student's IEP goals are continued does not
necessarily mean that . . . similar IEPs were not reasonably calculated to confer educational benefit").

added).

Delfarno explained that J.S. completed

several writing assignments that were assigned to all the 6th graders, but they
needed to be broken down into smaller steps. So if the regular 6th grade English
teacher was doing the writing assignment, for example, they did a memory lap.
So they may have done that in two steps. We probably took about four to five
steps to do that. So, you know, he needed sometimes one-to-one. You know . . . I
had to review with him one-on-one after he had written in order to correct
mistakes, but he would use different things like his AlphaSmart, which was a
portable word processor, and that would help him once he got passed [sic] the
brainstorming stage.

Id. at 28-29. Delfarno concluded that, with supports, J.S. was a successful student and that he

made progress.

Delfarno also explained that simply because subsequent IEPs continue to use the same

language as prior IEPs in describing a problem a student is having does not necessarily mean that

the student has not made progress in a particular area. She explained that even though a student

may be performing a skill only a "little bit better" or inconsistently, that does not mean that the

student has not made progress, it means that the student has not mastered the objective. Id. at

144. Delfarno explained that in order to properly evaluate a student's progress, a teacher must

consider testing and a student's overall daily performance in the classroom. Educational "levels

of progress must be judged with respect to the potential of the particular child." Lessard, 518

F.3d at 29 (also finding that "modest progress by most standards" was reasonable in light of a

student's disabilities).

Mackey, like Delfarno, testified that the more interested J.S. was in the subject matter the

less prompting he required to perform his work. She testified that J.S. received a grade of 79 on

an unmodified lab test taken with another student and a 94 on a moderately modified multiple

choice test.  Mackey explained that the modified multiple-choice test had three alternatives answers while the unmodified exam listed four alternative answers.[9]

J.S. received an A on his sixth grade science final exam.  Mackey explained, however, that for all students, because the final exam was "very lengthy" she only graded the part of the exam that the students completed; she did not penalize students for any part of the exam that was unfinished.  January 10, 2011, Transcript at 152.  J.S. answered approximately 70 questions on the final exam.[10]

Mackey also testified that J.S. made progress in her class.  She explained that she based this conclusion on the work J.S. performed during the year and because he did "really good, very good" on the final exam.  Id.  at 154. Mackey did not have any concerns about J.S.'s placement in her class.  In the end, both Mackey and Delfarno testified that J.S. got along well with other students and that he made progress in sixth grade.

While it is clear that J.S. struggled in certain subjects, J.S. performed well in other areas. In fact, Plaintiffs readily admit that J.S. made progress in reading.  In making their arguments before this Court, however, Plaintiffs focus only on J.S.'s area of weaknesses to the exclusion of his strengths.  In finding that J.S. made legally adequate progress, the hearing officer also considered the qualities J.S. possessed when he arrived at the Greenwood School.  J.S. started at the Greenwood School with academic and social skills developed in the Lincoln school system. After having been at the Greenwood School for only a short period, the Greenwood School's Fall 2008 reports noted, among other things, that J.S.:

---

[9]J.S. was also allowed to type his answers.

[10]The record is silent as to the portion of the exam that other students completed.

- "has some real strengths and a solid grounding in spelling[,]"

- "writes with a creative mind and vivid vocabulary[,]"

- "makes an effort to connect with other students in the class[,]

- "showed a strong understanding of life science concepts and is a very bright and curious student[,]"

- was "very involved in the learning process[,]"

- has "vocabulary and comprehension skills [that] have made science an area of strength for him[,]

- "was familiar" with "[m]uch of what [the class] studied this term[,]"

- "is a very creative young man[,]

- "got along well with the other students[,]

- "participated well in all of the activities and discussions and was respectful of his peers[,]"

- "identified and stated problems accurately, generated many excellent pros and cons and worked cooperatively with his classmates to solve a variety of problems[.]"

Plaintiffs' Exhibit 87 at 1, 4, 6, 7, 8, 10, 11. These early reflections of J.S.'s abilities by the Greenwood school staff, certainly based on his developmental and educational foundation in the Lincoln school system, buttress the hearing officer's conclusion that J.S. made progress while in the Lincoln school system.

The hearing officer acknowledged that the purpose of Mrs. S.'s and Dr. Lord's testimony was to establish that J.S. did not achieve reasonable and meaningful progress in the Lincoln

school system and that Lincoln could not adequately address J.S.'s needs.  As noted, however, the hearing officer heard conflicting evidence concerning whether or not J.S. made appropriate progress.  The hearing officer credited the testimony of J.S.'s educators over contrary evidence. See generally Sebastian M., 685 F.3d at 86 (it was proper for hearing officer to give more weight to testimony of educators "who interacted with [student] regularly").  This is "precisely that sort of first-instance administrative determination that is entitled to judicial deference" by this Court. Id.

In the end, the "hearing officer considered [a variety of] evidence of [J.S.'s] progress during his time [in the Lincoln school system] and the record indicates that [J.S.] did, in fact, make some progress." Sebastian M. v. King Philip Regional School District, 774 F. Supp. 2d 393, 407 (D. Mass. 2011) (noting that student's progress reports indicated student make progress), aff'd, 685 F.3d 79 (1st Cir. 2012).  Plaintiffs have not established by a preponderance of the evidence that the hearing officer's decision that J.S. made legally adequate progress in the Lincoln school system was erroneous.

## Did the August 8, 2008, IEP Offer J.S. a FAPE?

The hearing officer also determined that the August 8, 2008, IEP was designed to offer J.S. a FAPE.  Plaintiffs contend that the IEP did not offer a FAPE because it (1) failed to target all of J.S.'s special education needs; (2) failed to include measurable goals and objectives; and (3) proposed a placement similar to those that had failed in the past but with reduced services in J.S.'s area of educational need.

An IEP must include "the child's present level of educational attainment, the short- and long-term goals for his . . . education, objective criteria with which to measure progress towards

19

those goals, and the specific services to be offered . . . ."  Sebastian M., 685 F.3d at 84.  An IEP

must address the "full range of [a] child's needs" both academic and non-academic.  Lenn v.

Portland School Committee, 998 F.2d 1083, 1090 (1st Cir. 1993).

> Because a one-dimensional view of an IEP would afford too narrow a foundation
> for a determination that the program is reasonably calculated to provide effective
> results and demonstrable improvement in the various educational and personal
> skills identified as special needs . . . a district court's determination that an IEP
> complies with the [IDEA] necessarily involves a host of subsidiary
> determinations.

Id. (emphasis added) (internal quotation marks and citation omitted).  The IDEA does not require

that the Court "consider each unique need in isolation and make a separate finding regarding the

preponderance of the evidence in each and every identified area."  Id.  "In the last analysis, what

matters is . . . whether [the court] is cognizant of all the child's special needs and considers the

IEP's offerings as a unitary whole, taking those special needs into proper account."  Id.

It is clear that the hearing officer credited the testimony of J.S.'s educators when deciding

whether the August 2008 IEP offered J.S. a FAPE.[11]  See generally  Sebastian M., 685 F.3d at

86.  Delfarno testified that she used both the Dr. Holler and Dr. Lord reports as a basis for the

IEP and she incorporated many of their recommendations into the IEP.  She also based the IEP

on her personal knowledge of J.S., his classroom performance, and his history in the Lincoln

school system.

As an example of how she incorporated Dr. Holler's and Dr. Lord's recommendations

into the IEP, Delfarno testified that Dr. Holler's report stated that Lincoln needed to improve

J.S.'s "reading pleasure" so Delfarno included goals and benchmarks in the IEP that would

---

[11]Dr. Lord, who testified on behalf of Mr. and Mrs. S. and J.S., did not offer her opinion as to whether the
August 2008 IEP was designed to provide James with a FAPE.  In fact, as noted, Dr. Lord could not specifically
remember if she reviewed the August 2008 IEP.

improve J.S.'s reading engagement and comprehension skills.  January 10, 2011, Transcript at

59.  With respect to written language, Delfarno testified that both Dr. Holler and Dr. Lord

recommended that J.S. would benefit from "pre-writing activities," so the IEP included pre-

writing activities.  Id. at 60.

Furthermore, Delfarno testified that the IEP also took into account the plethora of

information Lincoln had on J.S.  Delfarno testified that the IEP

> was really designed for [J.S.] to be a successful [in seventh grade.]  He had a year
> at the middle school, so a year to adjust. There had been <u>numerous evaluations, so
> we had the quantitative [data], we had the qualitative data from the classroom,
> and I used all of that when compiling [the IEP]</u> and really felt like this was the
> best assessment of what his baseline was at the time, where he was at, and where
> we would like to see him go.

January 10, 2011 Transcript at 64 (emphasis added).

Plaintiffs argue that because the August 2008 IEP failed to address J.S.'s anxiety and

depression it was not designed to provide a FAPE.  Loretta Jones, ("Jones"), the school social

worker, developed the IEP goals for J.S.'s social/emotional development.  Jones also reviewed

both the Dr. Holler and Dr. Lord reports.  Jones testified that both reports noted J.S. had some

symptoms of depression and anxiety and that the August 2008 IEP addressed those concerns.

The August 2008 IEP states that according to "the June, 2008 evaluation by Dr. Karen

Holler, James demonstrates . . . poor regulation of mood and affect . . . ."  Plaintiffs' Exhibit 78

at 10 (internal quotation marks omitted).  Although both Delfarno and Jones testified that J.S. did

not present symptoms of depression or anxiety in school, Jones testified that the August 2008

IEP addressed depression or anxiety issues by giving J.S. a self-monitoring procedure to aid J.S.

in assessing his emotional state.  Delfarno also explained that if she observed symptoms of

anxiety or depression in J.S. she would have consulted with Jones and would have incorporated

more interventions into J.S.'s IEP.

Plaintiffs also argue that by offering J.S. a placement similar to those that Plaintiffs contend had failed in the past – but with a reduced level of services and supports – the August 2008 IEP failed to provide a FAPE. Plaintiffs' argument is a non-starter. "The educational benefits an IEP must be reasonably calculated to achieve are effective results and demonstrable improvement in the various educational and personal skills identified as special needs." Cranston School District v. Q.D., C.A. No. 06-538 ML, 2008 WL 4145980 at *9 (D.R.I. Sept. 8, 2008) (internal quotation marks and citation omitted). In addition, the IDEA favors mainstreaming and, to the extent appropriate, a disabled student should be educated with children who are not disabled. Id. The hearing officer found that J.S. made progress in the Lincoln school system under multiple IEPs. Thus, Plaintiffs' assertion that the August 2008 IEP was not designed to provide a FAPE because it was similar to those that "failed" in the past is controverted by the record of progress that J.S. made in the Lincoln school system. See generally Thompson R2-J School District v. Luke P., 540 F.3d 1143 (10th Cir. 2008) (although not dispositive, IEP modeled on prior IEPs that succeeded in generating some progress suggests that current IEP was reasonably calculated to continue the trend).

Plaintiffs next argue that the August 2008 IEP did not provide a FAPE because it failed to include measurable goals and objectives. Plaintiffs assert that the IEP provided a "completely unmeasurable goal for written language. . . ." Plaintiffs' Memorandum at 84. The IEP stated that J.S.'s goal for written language was that J.S. would "meet the standard on individual writing rubrics by writing pieces using a computer/portable word processor, that are focused and in logical order, using appropriate grammar, punctuation, capitalization and spelling." Plaintiffs'

Exhibit 78 at 7 (emphasis added).  Mrs. S. testified that she did not understand what "individual writing rubric" meant.  November 9, 2010, Transcript at 84.

Plaintiffs take a "one-dimensional view" of the IEP's writing goal.  See Lenn, 998 F.2d at 1090.  Plaintiffs isolate one phrase from one sentence in the IEP, remove it from its context, and conclude that the IEP was not designed to provide a FAPE.  Plaintiffs ignore Delfarno's testimony that J.S.'s writing rubric "would be based on what all [seventh grade students] are doing."  January 10, 2011, Transcript at 133.  Delfarno explained that the rubric would include the seventh grade standard for spelling, punctuation, and capitalization.  She clarified, however, that if it was "appropriate to individualize the rubric" for J.S. she would have done so.  Id.  If she had made such a modification, however, she testified that she would have used a consistent evaluation tool to measure J.S.'s progress.  Id.  The August 2008 IEP provided a measurable goal to evaluate J.S.'s progress in writing.  See generally W.T. and K.T. ex rel. J.T. v. Board of Education of the School District of New York City, 716 F. Supp. 2d 270 (S.D.N.Y. 2010) (failure to identify measurement methods did not result in denial of a FAPE where evidence indicated that the student's teacher would assess the student's progress over the course of the school year); P.K. ex rel. S.K. v. New York City Department of Education (Region 4), 819 F. Supp. 2d 90 (E.D.N.Y. 2011) (failure to identify measuring method was not denial of a FAPE where teacher testified she would take variety steps to measure progress); see also T.G. ex rel. v. Midland School District 7, ___ F. Supp. 2d ____, 2012 WL 264186 (C.D. Ill. January 27, 2012) (noting that writing is not a discipline that can generally be quantified like a content-based subject)

The hearing officer concluded that, based upon "all the evidence both testimonial and

from the exhibits," the August 8, 2008, IEP was designed for the unique needs of [J.S.] with

supports that would provide [J.S.] with an educational benefit from the instruction."  Hearing

Officer Decision at 44.  Plaintiffs have not established by a preponderance of the evidence that

the August 2008 IEP offered by Lincoln was inappropriate, that is, that it denied J.S. a FAPE.

The Court concludes that the record contains competent evidence to support the hearing officer's

decision.

Plaintiffs have thoroughly and exhaustively briefed this matter.  To the extent that

Plaintiffs have raised any argument that the Court has not specifically addressed in this

memorandum and order, that argument has been carefully reviewed by the Court and determined

to be without merit.[12]

For the reasons noted, Defendants' motion for summary judgment is granted and

Plaintiffs' motion for summary judgment is denied.

 SO ORDERED

/s/ Mary M. Lisi
Mary M. Lisi
Chief United States District Judge
August 23, 2012

---

[12]Because the Court finds that the Lincoln August 8, 2008, IEP did not violate the IDEA, the Court need not address wether the unilateral placement of J.S. at the Greenwood School was proper.  Slater, 2007 WL 2067719 at *4 n.2.